Walter FREAR, Cathy Frear, and Blake Frear, by and through his natural parents, Walter and Cathy Frear Appellants

v.

P.T.A. INDUSTRIES, INC., d/b/a Louisville Exterminating Company and Northwestern National Insurance Company Appellees

No. 1999–SC–0642–DG.

Supreme Court of Kentucky.

April 24, 2003.

Robert E. Reeves, Lexington, for Appellants.

Garry R. Kaplan, Patrick J. Murphy, Law Office of Garry R. Kaplan, Lexington, for Appellees.

KELLER, Justice.

## I. ISSUE

This Court granted discretionary review to address one issue. As part of the parties' oral agreement to settle their pending lawsuit, Appellants agreed to release Appellee P.T.A. Industries, Inc., d/b/a Louisville Exterminating Company ("PTA") from liability. When a "Release and Indemnity Agreement" was subsequently tendered for Appellants' signature, however, Appellants refused to sign the document because, in addition to releasing P.T.A. from liability, it required Appellants to indemnify P.T.A. against any future claims by third parties. Did Appellants breach the settlement agreement by refusing to sign the tendered release and indemnity agreement? Because an agreement to release a party from liability does not include an agreement to indemnify the released party unless the parties specifically agree to indemnification, we hold that Appellants did not breach the settlement

agreement by refusing to sign the tendered document.

## II. FACTUAL BACKGROUND

In 1983, Appellants sued Appellee P.T.A. and Cre–O–Tox Chemical Company ("Cre–O–Tox")[1] in the United States District Court for the Eastern District of Kentucky. In their lawsuit, Appellants claimed injury from their exposure to chlordane, a chemical contained in pesticide sprays distributed by Cre–O–Tox that P.T.A. had applied to Appellants' home. Appellants' primary claim against P.T.A. and Cre–O–Tox (collectively, "Defendants") concerned Cathy Frears's exposure to chlordane while she was pregnant with Blake.

In August 1986, the parties orally agreed to a settlement of the lawsuit. A few days later, the agreement was memorialized in a letter from Appellants' attorney to Defendants' attorneys that provided in pertinent part:

This letter is to confirm our settlement of the above captioned matter wherein P.T.A. Industries has agreed to settle for $40,000 and Cre–O–Tox has agreed to settle for $12,000 as regards the claims for Blake Frear. Because Walter and Cathy Frear do not want to continue on their behalf or Blake's behalf, their claims are being dismissed without payment.

Please forward to this office, as soon as possible, releases which you desire our clients to sign along with your respective checks made payable to Blake Frear, by and through his guardians Walter and Cathy Frear . . . .

In October 1986, while Appellants Walter and Cathy Frear were in the process of

1. Cre–O–Tox settled with Appellants after the Notice of Appeal was filed, and is thus not a party to this appeal.

seeking both appointment of a guardian for Blake Frear and court approval of the settlement agreement—i.e., before any party had satisfied his or her obligations under the settlement agreement—the federal court entered an agreed order dismissing the lawsuit with prejudice.[2] Later, in July 1987, after the appointment of Blake Frear's guardians, Defendants[3] presented the following document to Appellants for their signatures:

RELEASE AND INDEMNITY AGREEMENT KNOW ALL MEN BY THESE PRESENTS:

That we, Walter Frear, as Parent and Guardian ad litem[4] for Blake Houston Frear and Cathy Frear, as Parent of Blake Houston Frear, and Walter Frear and Cathy Frear in their individual capacities, for the sole consideration of Forty–Thousand Dollars ($40,000.00) to us in hand paid by P.T.A. Industries, Inc., d/b/a Louisville Exterminating Company, and Twelve–Thousand Dollars ($12,000.00) in hand paid by Cre–O–Tox Chemical Company, Jack Walton, individually, Bill Walton, Individually, Jack Walton and Bill Walton, d/b/a Cre–O–Tox Chemical Company, (hereinafter referred to collectively and individually as Payors), the receipt of which is hereby acknowledged, have released and discharged said Payors *and all other persons, firms, and corporations, both known and unknown,* of and from any all claims, demands, damages, actions, causes of actions, or suits at law or in equity of whatsoever kind or nature, for or because of any matter of thing done, omitted or suffered to be done by anyone prior to and including the date hereof on the account of the injuries, disease, condition of said Walter Grear [sic], Cathy Frear and Blake Frear, which occurred as a result of pesticide treatment of the home owned and occupied [sic] by Walter Frear, Cathy Frear and Blake Frear, on or about March 8, 1979, in Lexington, Fayette County, Kentucky. Including but not limited to the intended "Release", are all claims asserted by or on behalf of these parties and all parties in the civil action no. 83–220 brought in the United States District Court, Eastern District of Kentucky, at Lexington, by Walter Frear, Cathy Frear and on behalf of Blake Houston Frear.

We understand said Payors, by reason of their agreeing to this compromise payment, neither admit nor deny liability of any sort, and said Payors have made no agreement or promise to do or omit to do any act or thing not herein set forth and we further understand that this "Release" is made as a compromise to avoid expense and to terminate all controversy and/or claims for the injuries of Walter Frear, Cathy Frear and Blake Frear, or any and all claims in

---

**2.** The Agreed Order of Dismissal was entered pursuant to an Agreed Motion to Dismiss stating that "[t]he basis for this Motion is that the Defendants and plaintiff Blake Frear have reached an agreed settlement of this case and Plaintiffs Walter Frear and Cathy Frear desire to dismiss their cases without settlement but with prejudice and 'all parties desire that this case be dismissed with prejudice to all parties.'"

**3.** The release was enclosed in a letter to Appellant's attorney from Cre–O–Tox's attorney, who had taken the lead in securing a release

from Appellants. The letter, however, was copied to P.T.A.'s lawyer.

**4.** Although the order appointing Walter Frear as Blake Frear's legal guardian does not appear in the record, we observe that the "guardian ad litem" language appears to be a misnomer because only a legal guardian, and not a guardian at litem, could settle Blake Frear's claim. *See Jones by and through Jones v. Cowan,* Ky.App., 729 S.W.2d 188, 189 (1987).

any way growing out of or connected with the aforesaid accident.

We admit that no representation of fact or opinion has been made by the said Payors or anyone on their behalf to induce this compromise and that said compromise was made by us with the benefit and upon advice of counsel and *it [is] specifically agreed that this "Release" shall be a complete bar to all claims or suits for injuries or damages of whatsoever nature resulting or to result from said accident.*

That Walter Frear and Cathy Frear do hereby agree, as a part of the COM-PROMISE SETTLEMENT, RELEASE AND INDEMNITY AGREEMENT, do hereby agree to indemnify said Payors listed above from any and all future claims growing out of or related to the alleged incident of March 8, 1979 in Lexington, Fayette County, Kentucky, or the general allegations as set forth and contained in said civil action no. 83–220 as set forth above. As part of this indemnity agreement, Walter Frear and Cathy Frear do hereby agree to indemnify said Payors for any judgments, any claims, any expense, legal expense or cost otherwise incurred by said Payors as a result of any and all future claims by or on behalf of Walter Frear, Cathy Frear or Blake Houston Frear against said Payors, their successors or representatives.[5]

Shortly thereafter, in a letter to Cre–O–Tox's attorney that was copied to P.T.A.'s attorney, Appellants notified Defendants that they would not sign the tendered release because of its indemnification provision:

I have talked to my client and we are not going to sign the release and indemnity agreement you proposed. As far as I'm concerned, that would make the Frears indemnify any third party who might have been injured or be injured in the future as a result of chlordane in that home and that is something that they will not do.

I will advise them to sign a standard release, but I will not advise them to sign one indemnifying you as I think that, clearly, is not required by the settlement.

And, in subsequent communications between the parties and in pleadings filed in the trial court, Appellants articulated additional objections to the release language indicated above in italics. Specifically, Appellants objected that this language: (1) released not only the named defendants, but also "all other persons, firms, and corporations, both known and unknown"; and (2) not only prohibited future claims against the named defendants, but also would "be a complete bar to all claims or suits for injuries or damages of whatsoever nature resulting or to result from said accident." In other words, Appellants objected to what they characterized as the overbreadth of the release language.

As to the indemnity provision (underlined in the language quoted above), Appellants' primary objection was that it purports to require them to indemnify Defendants if, in a subsequent action, a third

---

**5.** Italicized and underlined emphasis added. Several proposed documents were circulated among the parties, and some confusion exists as to which release was actually presented to Appellants. In particular, we observe that, in its opinion, the Court of Appeals quoted from a different document. However, because the proposed document quoted above is the only one of the proposed "releases" that contains both the broad general release language (*italicized*) and the indemnity provision (underlined) to which Appellants objected, we conclude that it was Appellants' failure to sign *this* proposed "release" that lies at the heart of the breach of contract dispute.

party's liability for an injury to Blake Frear is assigned, in whole or in part, to one or both Defendants. Appellants posited that Blake Frear may wish to pursue a product liability claim against the chlordane manufacturer, and Appellants feared that the third-party indemnity provision may "have the effect of cutting off those claims under *Crime Fighters Patrol v. Hiles,* Ky., 740 S.W.2d 936 (1987)."

Appellants substantially redrafted the tendered document and then signed and submitted to Defendants a "Compromise Settlement, Release, and Indemnity Agreement," which released only the Defendants and which indemnified Defendants only "for any judgments [sic], any claims, any expense, legal expense or cost otherwise incurred by said Payors as a result of any and all future claims by or on behalf of Walter Frear, Cathy Frear or Blake Houston Frear ...." Subsequent correspondence and drafts circulated between the parties demonstrate that, although Defendants were willing to modify the scope of the release language to accommodate Appellants, Defendants continued to insist that, to perform their obligations under the settlement agreement, Appellants must agree to indemnify Defendants against any third party claims.

As a result of the impasse, Appellants filed a lawsuit in Fayette Circuit Court alleging a variety of claims—ranging from an alleged bad faith breach of contract to an alleged violation of the Unfair Claims Settlement Practices Act—and seeking compensatory and punitive damages from Defendants and their insurers. Defendants countered by claiming that Appellants could not obtain relief for any failure by Defendants to perform their obligations under the settlement agreement because Appellants themselves had breached the settlement agreement by refusing to execute the "Release and Indemnity Agree-

ment" that Defendants originally tendered. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment to Defendants after concluding that Appellants had breached the settlement agreement:

> The pre-dismissal correspondence between the parties setting forth the terms of the agreement placed no limitations on what type of release was to be tendered. Therefore, this court finds that a valid oral contract between the parties exists requiring the Plaintiffs to sign the release tendered by the Defendants prior to dismissal and requiring the Defendants to tender to the Plaintiffs $52,000.00. The signing of the releases and the payment of monies are concurrent conditions. The Plaintiffs defaulted on the contract when the Defendants made a conditional tender of the monies to the Plaintiffs and the Plaintiffs failed to execute the releases. Therefore the Plaintiffs are in breach of said contract and are estopped from asserting a claim of nonperformance against the Defendants under the same contract. Needless to say the Plaintiffs' claims of unfair settlement practices are rendered moot by this ruling.

On Appellants' direct appeal, the Court of Appeals agreed with Appellants that the terms of the settlement agreement "entitled [them] to a release that is limited to [P.T.A.] and that expressly preserves their right to seek damages from any person or entity responsible for Blake's injuries." However, the Court of Appeals found the terms of the settlement agreement ambiguous as to the indemnity issue and held that P.T.A. "reasonably believed, and was induced by the Frears' silence to believe, that it was buying its peace in this matter and so is entitled to a release that

includes an indemnification provision."[6] We granted Appellants' motion for discretionary review to consider the issue of whether Appellants were required to execute an indemnity agreement before they were entitled to receive the settlement proceeds.

## III. ANALYSIS

 As "[s]ettlement agreements are a type of contract and therefore are governed by contract law,"[7] we begin with the observation that, under contract law, an oral contract is ordinarily no less binding than one reduced to writing.[8] And, although a question of fact appropriate for jury resolution will exist when a genuine issue of material fact exists as to *whether* the parties reached an oral agreement,[9] we have no such dispute here because both parties agree that: (1) they reached a valid, oral settlement agreement in reliance upon which Appellants' federal lawsuit was dismissed with prejudice; and (2) the August 28, 1996 letter from Appellants' counsel confirming the oral settlement accurately reflects the terms of their oral settlement agreement. Accordingly, because "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court,"[10] we review de novo the lower courts' interpretations of the parties' oral settlement agreement.[11]

 As such, we first must determine whether the terms of the parties' settle-

---

**6.** Although we ultimately conclude that the Court of Appeals's analysis is flawed for other reasons, we observe that—to the extent that its interpretation rests on its conclusion that P.T.A. "was induced by the Frears' silence to believe" that their settlement agreement included an agreement by the Frears to indemnify P.T.A. against third-party claims—the Court of Appeals misinterpreted the extrinsic evidence that it improperly considered. In fact, a few days before the parties reached the settlement agreement at issue here, Appellants extended to P.T.A. alone a separate offer to settle, and wrote: "We will agree to give you a full and unconditional indemnification *against any crossclaim Cre–O–Tox may have as a result of any verdict by my clients, the plaintiffs, against Cre–O–Tox.*" (emphasis added). The Court of Appeals interpreted the indemnification language in this settlement offer as evidence that "the Frears were aware that indemnity was a benefit of the bargain upon which the defendants were very likely to count." In our view, however, when the presettlement correspondence, which included indemnity language, is considered alongside the final settlement agreement, which did not, the absence of any indemnification language in the final agreement appears less like "silence" and more like a purposeful omission. And, in any event, we observe that, in this settlement offer Appellants extended just days before the actual settlement, they offered to indemnify P.T.A. only against the co-defen-dant's cross-claims—not the global indemnity against any and all claims, including claims by third parties, that was included in the documents later tendered by Defendants.

**7.** 15 AM. JUR. 2D, *Compromise and Settlement* § 9 (2000).

**8.** *Motorists Mut. Ins. Co. v. Glass*, Ky., 996 S.W.2d 437 (1997).

**9.** *Id.; Audiovox Corporation v. Moody*, Ky. App., 737 S.W.2d 468 (1987); *Hickey v. Glass*, Ky., 285 Ky. 848, 149 S.W.2d 535 (CR 76.12(4)(g)), 285 Ky. 848, 149 S.W.2d 535 (1941).

**10.** *First Commonwealth Bank of Prestonsburg v. West*, Ky.App., 55 S.W.3d 829, 835 (2000). *Accord Morganfield Nat. Bank v. Damien Elder & Sons*, Ky., 836 S.W.2d 893 (1992); *Hibbitts v. Cumberland Valley Nat. Bank & Trust Co.*, Ky.App., 977 S.W.2d 252 (1998).

**11.** *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, *supra* note 10 at 835–6 ("As the trial court's decision . . . is a matter of law, our standard of review is de novo."); *A & A Mechanical, Inc. v. Thermal Equipment Sales, Inc.*, Ky.App., 998 S.W.2d 505, 509 (1999) ("The trial court's conclusions of law, however, including its interpretation of the written contract, are subject to independent appellate determination.").

ment agreement are ambiguous [12] because our resolution of the ambiguity question will dictate how our interpretive analysis will proceed. If an ambiguity exists, "the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written," [13] by evaluating extrinsic evidence as to the parties' intentions.[14] However, "[i]n the absence of ambiguity a written instrument will be enforced strictly according to its terms," [15] and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.[16]

We agree with the trial court's conclusion that the parties' settlement agreement contained no ambiguity. In concluding

that the parties' agreement was a valid contract, the trial court recognized that the agreement's terms "are evidenced by the correspondence between the parties, particularly the letter from Plaintiffs' counsel dated August 28, 1986." [17] Although the Court of Appeals subsequently found the terms of the oral settlement agreement ambiguous and construed the agreement as entitling P.T.A. "to a release that includes an indemnification provision," we find substantial evidence supporting— and no evidence contradicting—the trial court's conclusion that the oral settlement's terms are set forth in the letter that memorialized the agreement. As such, the agreement, in no uncertain terms, requires Appellants to execute a release, not an indemnification provision against third-party claims.

---

**12.** And, in so doing, we recognize that "[a]n ambiguous contract is one capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, Ky., 617 S.W.2d 32, 33 (1981). *See also Transport Ins. Co. v. Ford*, Ky.App., 886 S.W.2d 901, 905 (1994) ("To determine that an ambiguity exists, the court must first determine that the contract provision is susceptible to inconsistent interpretations.").

**13.** *Whitlow v. Whitlow*, Ky., 267 S.W.2d 739, 740 (1954).

**14.** *Teague v. Reid*, Ky., 340 S.W.2d 235 (1960); *Hammon v. Kentucky Cent. Life & Acc. Ins. Co.*, Ky., 289 S.W.2d 726, 728 (1956) ("Hence, the case falls within the rule that parol evidence may be introduced to ascertain the true meaning of ambiguous or uncertain terms of a written contract.").

**15.** *O'Bryan v. Massey–Ferguson, Inc.*, Ky., 413 S.W.2d 891, 893 (1966). *See also Mounts v. Roberts*, Ky., 388 S.W.2d 117, 119 (1965) ("In the absence of ambiguity a written instrument will be strictly enforced according to its terms."); *Codell Const. Co. v. Commonwealth*, Ky.App., 566 S.W.2d 161, 164 (1977) ("The final contract that resulted from the acceptance of the bid is not ambiguous, and is therefore not susceptible to any reformation

or other rewriting by this Court."); 17A AM. JUR. 2D, Contracts § 337 (1991):

> As a general proposition, where the terms of a writing are plain and unambiguous, there is no room for construction, since the only purpose of judicial construction is to remove doubt and uncertainty. . . . [I]t is only where the language of a contract is ambiguous and uncertain that a court may, under well-established rules of construction, interfere to reach a proper construction and make certain that which in itself is uncertain.
> *Id.*

**16.** *Hoheimer v. Hoheimer*, Ky., 30 S.W.3d 176, 178 (2000) ("The trial judge was clearly erroneous in admitting extrinsic evidence to vary the terms of a series of unambiguous deeds of conveyance.").

**17.** Notwithstanding the trial court's implicit factual findings, the resolution of the case via summary judgment evidences a conclusion that the contract terms were unambiguous. If the trial court had perceived an ambiguity, a material issue of fact would have existed to preclude summary judgment. CR 56.03; *Cook United, Inc. v. Waits*, Ky., 512 S.W.2d 493, 495 (1974).

■■■■ "Release" and "indemnity" are related, but, nevertheless distinct, legal concepts. "A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised. In other words, a release is a discharge of a claim or obligation and surrender of a claimant's right to prosecute a cause of action."[18] Indemnity, on the other hand, is "[a] duty to make good any loss, damage, or liability incurred by another."[19] Thus, "[a] 'release' and 'indemnity' are distinguishable in that a 'release' extinguishes a claim or cause of action whereas an 'indemnity' arises from a promise by the indemnitor to safeguard or hold harmless a party against an existing or future loss, liability, or both."[20] In recognition of the distinct legal concepts, we hold that an agreement to sign "a release" contemplates only a release from liability and not Indemnification from third party claims.

■■■■ Although Appellees' primary argument before the Court of Appeals and again in this Court is that Appellants should have anticipated that Defendants wanted indemnity against future claims because they were seeking to "buy their peace," the settlement agreement itself, in clear, unambiguous language, required Appellants to sign a release; it did not require them to execute a release *and* an indemnification provision. And, an otherwise unambiguous contract does not become ambiguous when a party asserts—especially post hoc, and after detrimental reliance by another party—that the terms of the agreement fail to state what it intended. Accordingly, under the terms of the settlement agreement, Appellants were obligated to release Defendants from liability, and therefore, Appellants did not breach their contractual obligation by refusing to sign the non-conforming documents tendered by Defendants. To the contrary, Appellants fully performed their obligation when, in October 1988, they executed the "Compromise Settlement, Release, and Indemnity Agreement" that their attorney had drafted in response to the documents originally tendered by Defendants. Appellants' counsel's previous invitation for defense counsel to submit a release "which you desire our clients to sign," permitted P.T.A. to draft a proposed release, but certainly did not reflect any agreement that P.T.A. had carte blanche to include other terms, including indemnity provisions, within its proposed "release." When Appellants executed a release in accordance with the terms of the oral settlement agreement, P.T.A. was obligated to give Appellants $40,000.00, and P.T.A. therefore breached the settlement agreement when it failed to do so.

## IV. CONCLUSION

For the above reasons, we reverse the decision of the Court of Appeals and remand this matter to the trial court for it to: (1) vacate its earlier grant of summary judgment for Appellees; (2) enter a new summary judgment for Appellants on their breach of contract claim; and (3) allow

---

18. 66 AM. JUR. 2D, *Release* § 1 (2001). *See also* BLACK'S LAW DICTIONARY 1292 (7th ed.1999) ("1. Liberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced .... 2. The relinquishment or concession of a right, title, or claim.").

19. BLACK'S LAW DICTIONARY 772 (7th ed.1999). *See also id.* at 773 ("Indemnity clause. A contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur.").

20. 66 AM. JUR. 2D., *Release* § 1 (2001).

Appellants' action to proceed in accordance with this opinion.

All concur.